HOUGHTON (HILL v.). See Case No. 6,493.

HOUGHTON (SHELDON v.). See Case No. 12,748.

HOUGHTON (UNITED STATES v.). See Case No. 15,396.

## Case No. 6,731.

### The HOUND.

[27 Law Rep. 29.]

District Court, New York.[1] June Term, 1864.

SHIPPING — CHARTER TO CARRY CHINESE COOLIES —VALIDITY AND CONSTRUCTION—ESTOPPEL—CUSTOM.

[1. The charter of a ship to carry Chinese coolies from China to a foreign country was not void, on the ground of immorality, before American vessels were prohibited by act of congress from engaging in it: for the fact that the business is subject to abuses is no evidence that it is immoral in itself.]

[2. The fact that persons who chartered a ship for the purpose of carrying Chinese coolies caused her to be surveyed, and a diagram made and delivered to the captain, showing the number of passengers she could carry according to the regulations of the act of congress, does not of itself limit the charterers to that number, in the absence of any evidence that such diagram was made a part of the contract.]

[3. The provisions of the general passenger act (10 Stat. 715, § 1), limiting the number of passengers which vessels may carry, apply only to vessels bringing passengers into this country, and do not affect American vessels carrying passengers from one foreign country to another; hence the use of the words "lawful passengers," in the charter of a ship for the purpose of carrying passengers between foreign countries, must be understood to refer to such description and number of persons as by law could be carried between the countries where the voyage was to begin and end.]

[4. A ship was chartered to carry coolies from China to the West Indies, but on arrival in China a dispute arose between the charterers and the master as to the number of passengers which the charterers were entitled to put on board. The matter was thereupon referred to the American commissioner in that port, who decided that the ship must be restricted to the number authorized by the general passenger act (10 Stat. 715, § 1). Held, that this decision was no bar to the maintenance of a suit by the charterers to recover for alleged breach of the charter party in limiting the number of passengers.]

[5. A provision in a charter party that the vessel shall carry "all such lawful passengers"

1 [District not given.]

as charterers' agent shall think proper to ship, must be construed reasonably, and means a reasonable number only, having regard to comfort and safety.]

[6. A custom in the particular business (the Chinese coolie traffic) of overcrowding vessels could have no binding effect in the construction of the charter, so as to require the vessel to carry such a number as would be dangerous to life and health.]

In admiralty.

SHIPMAN, District Judge. The libellants in this suit are Tait & Co., of Amoy, in China, and the claimants Charles Mallory and others, of Mystic, in the state of Connecticut, owners of the ship Hound. The libel is founded upon a charter party entered into at the city of New York, which, among other stipulations, contains the following: The libellants agreed to charter the ship for the voyage from the port of New York to any safe port or ports in the world where the vessel could safely float, the vessel, upon the completion of the voyage, to be delivered in New York, and the charter to terminate on discharge of the cargo. The charter was to continue at least eighteen calendar months, and might continue thirty, at the option of the libellants. The claimants were to keep the vessel in good order, provided with every requisite, including men and provisions. The whole ship, with the exception of cabin, deck, and necessary room for the accommodation of crew and the stowage of cables and provisions, was to be at the use and disposal of the libellants, and no goods or merchandise of any kind were to be taken on board without their consent, on pain of forfeiture of the amount of freight agreed on for the same. The claimants (owners of the ship) were to take and receive on board, during the voyage, all such lawful goods and passengers as the libellants and their agents might think proper to ship. The between-decks, if required by the charterers, were to be kept clear of all provisions, water, etc. The claimants were to man the ship and victual the crew, the libellants to pay port charges, pilotage, stevedores, and for ballast, and to furnish passengers with everything required, such as berths, provisions, water, firewood, etc. The libellants were to pay as charter money at the rate of twenty-five hundred dollars per month. The particular terms of payment it is unnecessary to state. It was also stipulated that in case the ship should, in stress of weather, or other cause, danger or accident, be turned from the due course of the voyage, then the payment of the charter money should, during such time, cease, always excepting mutiny among passengers, and being obliged to put into port on their account. If the ship was detained beyond the time fixed by the charter party, demurrage was to be paid by the libellants at the rate of eighty-three dollars per day. The penal clause binds the parties in the sum of thirty thousand dollars. There are some oth-

er stipulations in the instrument, which it is not important to notice here. By an indorsement on the charter party, it appears to have commenced to run on the 25th of September, 1854. After counting upon the stipulations of the charter party, the libel alleges that the ship entered on the voyage, and in due course arrived at Macao in China, at which place she was furnished and provisioned by the libellants for four hundred passengers, to be carried from Hong Kong in China to Havana in the island of Cuba, but that the captain of the Hound refused to take that number, and took only two hundred and thirty. The libel also alleges that, by the laws of China and Spain, in force at the ports of departure and destination, the ship could have lawfully taken the whole four hundred passengers, and that, by the usage and custom of the port of departure, that was a reasonable and proper number. The damages for this alleged breach of the charter party, in refusing to take the required number of four hundred passengers, are then set out in the libel.

To this libel the claimants have filed an answer, setting up various allegations and denials. The answer denies, on information and belief, that the libellants furnished supplies for or tendered for transportation more than two hundred passengers. It alleges that the size of the ship was inadequate to the transportation of more than two hundred and thirty passengers (which was the number she actually carried), without endangering their health and lives, especially as the voyage was made during the hot season. It further alleges that, before the ship left the port of New York on her voyage, the libellants caused her to be measured and surveyed by a surveyor of this port, her superficial feet of room to be ascertained, a diagram of the same to be made and delivered to the captain with the other papers of the ship; and it is averred that, by this diagram, it is evident that two hundred and nineteen passengers—or one to every fourteen superficial feet—were intended to be carried, and no more, that being the largest number permitted by the statutes of the United States. The answer further alleges that, after a difference arose at Macao between the master of the Hound and the agent of the libellants, they both went before the Hon. Peter Parker, the commissioner of the United States, resident in China, and submitted to him the questions at issue between them, and that he decided that two hundred and nineteen passengers were all the ship was bound to take, on the ground that that number was all that she could lawfully carry under the laws of the United States. The answer then avers that, by force of the treaty between the United States and China, the action of the commissioner is binding on the parties in this suit, and a good defence to the claim set up in the libel. It is not necessary to notice the other allegations of the answer here.

The proofs taken in the cause are very voluminous, and the elaborate arguments submitted to the court embraced a wide range of topics. The court can do little more than present the material facts which it finds proved, and state the principles of law which applies to them, without pursuing the discussion at very great length. When stripped of the formal phraseology in which it is wrapped, the contract is what is well known among a certain class of commercial adventurers as a "Coolie Charter," an agreement by which American vessels, as well as others, were for a time engaged for the purpose of transporting Chinese laborers, called "coolies," from China to Cuba, California, and some other places. The object of the voyage was perfectly well understood by both parties at the time the contract was entered into. The libellants made no secret of it, and one of the owners, at least, was very far from ignorant of the intended destination of the ship, although he exhibited some reluctance in admitting it on the stand. Whether he had any direct knowledge of the object of the charterers at the moment of signing the charter party or not, he knew, before the ship sailed, that she was going to China after coolies, and he armed her with that view. The ship sailed, and arrived in due time in China, where she was to receive coolies and transport them to the island of Cuba. Here a difference arose between the charterers and the captain of the Hound as to the number to be carried. Reference was had to Mr. Parker, the resident commissioner of the United States, resident in China, and he advised that by the laws of the United States, and the terms of the charter party, two hundred and nineteen passengers were all the ship should take. She did, however, take two hundred and thirty. It was insisted on the trial that the charter of this ship was void, as against morality. But the court has been unable to perceive how the transportation of Chinese is any more immoral per se than the transportation of German or Irish passengers. It is claimed that great abuses have resulted from the business. But these abuses grew out of overcrowding the ships, and not out of the nationality of the passengers. Frauds may have been practiced upon the Chinese emigrants, both before and after they were transported, but these frauds are not chargeable to the carrying of the persons on shipboard. These frauds, and the practice of overcrowding the ships, very likely induced congress to enact a law prohibiting American ships from participating in the business altogether; but this fact does not authorize a court to pronounce a contract entered into before such prohibition null and void. An immoral act is one which is wrong of itself, and not merely from the manner in which it is performed. And it is easy to see that the transportation of Chinese passengers, when free from fraud and properly conducted, may be as innocent as any other business. The abuses to which a business is subject may call for its prohibition by legislation altogether, but this is no evidence that it is immoral in itself. This point is, therefore, not well taken.

It was also claimed, on the trial, that the diagram furnished the ship here, before she sailed, showed that the ship could carry but two hundred and nineteen passengers, and that this diagram became part of the contract, and must determine its construction. But the court has looked in vain for any evidence which would warrant the conclusion that this diagram became a part of the charter party. If that was intended by the parties, why was it not annexed to the charter party, or so referred to in it as to connect the two instruments together? And why did not the master of the Hound rely upon it in China, and take but two hundred and nineteen passengers, as the diagram and the passenger act of the United States indicated, if this was part of the contract? There is no point of view presented by the evidence which would warrant the court in holding that any particular number of passengers was fixed upon by the charter party, or by any definite agreement of the parties. The court is of opinion, upon the whole evidence, that, while there was no definite number fixed upon, it was, nevertheless, generally expected, both by charterers and owners, that the ship would carry about three hundred and fifty or four hundred. She was going upon what was called a "coolie voyage," and the number to be carried, in the absence of any specific stipulation, would naturally be understood as the usual number. I think the evidence in the case shows that such usual number was about three hundred and fifty or four hundred.

The claim set up in the answer, that the action of Mr. Parker, in China, who appears to have been referred to for advice, is a bar to this suit, is without foundation. This court is neither bound by his conclusions on the facts submitted to him, or on the law applicable to the case. Besides, the claimants themselves repudiated his advice, which was to be governed as to the number of passengers to be carried by the passenger act of the United States, whereas they disregarded that act, and took eleven passengers beyond the number allowed by it. The charter party obliges the claimants to receive on board all such "lawful passengers" as the libellants might choose to ship. It is contended that by this term "lawful passengers," it was intended to limit the number to that allowed by the general passenger act of congress. But, on examination of the first section of that act (10 Stat. 715), it will at once be seen that it refers in terms to persons taken on board with intent to bring them into the United States. The object of the law was to prevent the overloading of immigrant ships, and had no reference to

vessels owned by citizens of the United States, which might be engaged in carrying passengers between foreign countries. By the terms of the first section, the prohibition includes vessels owned by "any citizen of a foreign country," as well as those owned by citizens of the United States, and it follows, of course, that congress did not undertake to prescribe the number of passengers which ships owned by foreigners should carry between foreign countries. The term "lawful passengers," therefore, used in the charter party, must refer to such description and number of persons as by law could be carried between the countries where the voyage was to begin and end. No law of Spain or China has been proved before the court which prohibited the Hound from taking the whole number tendered.

We now come to the remaining and only important question in the case. All contracts are to have a rational construction, and one consistent with the principles of common sense and humanity. By this charter party the Hound was to take on board and carry "all such lawful passengers" as the libellants or agent might think proper to ship. This must be construed, not literally, but reasonably. "All," so far as the number is concerned, means a reasonable number and no more. No one would pretend that if the libellants had tendered eight hundred the ship would have been bound to take them, because such number would have overcrowded a ship of her size, and put the lives of both crew and passengers in jeopardy. It is obvious, therefore, that she was not bound to take a greater number than could be carried with reasonable comfort and safety. And the real question in this case is, what that number was. The libellants insist that the number tendered, which was four hundred, could have been lawfully and safely carried, while the claimants contend that they carried all that was safe or proper, which was two hundred and thirty. From a full and careful examination of the custom, and the incidents of this peculiar trade, the court is of opinion that four hundred would have been an unreasonable number. It may have been warranted by custom, but that custom of overloading ships with this class of passengers discloses so many dangers and abuses, that a decent regard to the life and health of human beings demanded a departure from the custom. But the court is equally clear that, while four hundred would have been an unreasonable number to have received on board, yet that two hundred and thirty was a less number than might have been safely carried. After weighing carefully the whole evidence bearing upon this point, I am satisfied that the ship could have safely carried two hundred and eighty passengers of this class, and that she was bound to receive at least that number on board when tendered. I think this number could have been transported with as much safety

12FED.CAS.—38

and comfort on that voyage as two hundred and nineteen European emigrants could have been brought over in the same ship from Europe. It follows, therefore, that there must be a decree entered for the libellants, with an order of reference to compute the damage suffered by them in consequence of the failure of the ship to bring the fifty passengers which her officers improperly rejected. Let the decree be so entered.